Case number 241777 Brian J Lyngaas DDS PLLC v. United Concordia Companies, Inc. et al. Argument not to exceed 15 minutes per side. Mr. Bock, you may proceed for the appellant. Good morning, Your Honors. My name is Philip Bock. I'm here on behalf of Dr. Lyngaas. Good morning. I would like to reserve five minutes for rebuttal, if I could. Yep. This case is about whether the faxes that United Concordia sent Dr. Lyngaas in 2021 are advertisements. The district court ruled that they were not. The plaintiff argues that the district court misconstrued the definition, the statutory definition, by focusing on whether the products advertised in the faxes were United Concordia's as opposed to somebody else's. The statutory definition says that any material that's advertising the commercial availability or quality of any property, goods, or services can only be sent by fax if the sender has the prior express invitation or permission of the recipient. The content of each of the three faxes, we've pasted them into our brief, are... What's the difference? I mean, if you don't mind, Mike, going right to the thing that I'm struggling with is comparing the faxes in Sandusky to, say, the ProfiMagic fax here. Like, just isolate that one and compare it to the ones attached at the end of the Sandusky opinion. So I'm just looking at them right here, and I would agree with part of your argument that when you read the Concordia one, it does just look a little more like an advertisement. I just have to – you know, discounts, it just has – it's promotional. Now, it's promoting something else for sure, which is what makes the case hard in trying to figure out how that works. But I find myself just really puzzled over just – is this just a pure form situation where Concordia in the future – let's say you win. In the future now, it just has to look at the Sandusky one, and instead of being more direct about, hey, there's a 10% discount, you should consider using – you should use this. Whereas in Sandusky, it's, we'd like to notify you about the plan preferred, so that's something. Please consider prescribing plan preferred drugs. I mean, I just find myself saying, is this just literally getting the lawyer to rewrite the ad? Because I feel like as a matter of content, this wouldn't have made – it wouldn't have changed much behavior or been much difference in terms of its annoyance. So do you know what I'm saying when I make this point? Is that resonating with you as to why I'm asking this? I hope so. I think so. OK. What do I do with that? It seems like so formalistic. Well, the Sandusky case was difficult because looking at it, an ordinary person wouldn't understand that it is an advertisement. Well, that's what I'm puzzled over. It's still suggesting using these drugs. I mean, if you're – the vendors are selling this syringe thing. The vendors here are the drug makers. Yeah. Surely there's no difference in the number of sales that grow out of these two ads, right? I mean the vendors are benefiting immensely from the Sandusky ads because it says here are the – whatever they are, eight preferred drugs. Well, they're competing. They're competing manufacturers, so it's not an ad for the manufacturers. The sender doesn't work with the manufacturer. Surely it is. It is an ad for the – that's my point. Well, it's advertising their products, but they didn't know about it. And I didn't bring the case and the court ruled that it wasn't an advertisement. But, I mean, presumably they had – don't you think it's like this case in the sense that the insurance company had this relationship with the vendors? And they got a deal by being the exclusive saying these are – by saying you're preferred, we'll pay for it and it will be a little cheaper. That's the incentive of the insurance company, to pay less. So it just seems economically identical. Well, I think the point is if you start off with there's a statute that says you can't send advertising without express permission, then they shouldn't send it. Yeah, but I have to start – I agree with that language, but I have to start with the assumption that Sandusky correctly construed that. Okay. And that these types of ads are okay. That's my problem. I think you could make the argument Sandusky's wrong, that these are commercial ads. But that's not how we deal with it. Well, I guess if an advertisement is nuanced enough, it won't be found to be an advertisement. And you think it's nuanced enough, please consider prescribing these planned preferred drugs and then listing them. Yeah, but they weren't saying it on behalf of – they weren't doing it pursuant to a marketing contract with those manufacturers. They weren't sending it to the – for that reason. I mean, I don't know. Sandusky doesn't say anything about that. Yeah, I think that was a motion to dismiss case, so the court said – No, I thought Sandusky was a summary judgment case. Oh, I know. Fulton's the motion to dismiss case. Yeah, that's true. Yeah, you're right. I mean, so your point is Sandusky should have come out the other way if it turns out that these eight drug makers had an agreement with whatever it was the defendant there to exclusively market their drugs. But I have to believe that's always true in these kinds of settings. I mean, this case would be different if the facts had said United Concordia has exclusive discounts available to you and you can go online or look in your provider book to see them or we'll send you something in the mail about it or let us know if you're interested. You could list them because they're listed in Sandusky. Well, those are just the names of competing drugs that have been approved by insurance companies for payment, right? It's planned preferred lipid-lowering agents. I know we distinguished the – you know, we're not arguing Sandusky's wrong. We're saying that Sandusky's right because it was applying the statute as written. And Sandusky has a statement in there about would ordinary people see these or ads, and it says ordinary people wouldn't see it. So we have to roll up our sleeves to really figure out if this thing is an advertisement prohibited by the statute as opposed to an advertisement just in the sense that – in a more general way. So the TCPA specifically prohibits advertising material, material advertising, commercial availability or quality, property goods or services. Sandusky says that fax didn't do that, didn't satisfy that. But these do because you don't have to engage in too much statutory analysis just to read the statute and then look at the fax and say these do that. They do advertise the price, the percentage, how to get it, the quality. They don't have competing things. It's like they've made a choice for you. Dr. Lingus says, I already have those things. I don't need those. I don't have student loans. Well, that's why I'm – the student loan one I'm not too enthused about given that your client, who's pretty good at saving these faxes, didn't have it in his litigation folder. So that's why I'm focused on ProfiMagic. But if you win on ProfiMagic, you're doing pretty well. So I would keep the focus there. Another feature of ProfiMagic that I'm just trying to – is in an ad. They're saying we used to give you this stuff for free during COVID. We can't keep doing that anymore. Or we gave you $10 or whatever. So we were helping you pay for these things during COVID. We can't do that anymore. Here's an option. Doesn't that seem like just the kind of thing you would expect them to do in their relationship with the dentist? You've now got a problem. We can't subsidize these products. You should know we have this relationship with ProfiMagic where you get a 10% discount as a way of replacing, whether it was free or subsidized products. I mean, isn't that what you would expect with your relationship between insurance company and dentist? No. No. Yeah. So Dr. Lingus testified that he has been in 50 different insurance networks. And they can all negotiate discounts. I mean, I'm a member of the American Bar Association. I know they have discounts. I do know why he's in 50 different networks. And it isn't just dentistry. Oh, I don't know that. It's not for fax cases or something like that. Oh, it isn't? Okay. I was thinking he was part dentist, part claimant. Well, so junk faxes are illegal. Advertisements are illegal if you get them on your fax machine and the person didn't get your express permission beforehand. Nobody wants them. Nobody gives permission. They could have written a contract that said express permission, you agree to receive advertisements on your fax machine. Maybe people wouldn't sign up to be a provider or they would figure out a way not to. Dentists have fax machines for patient information and coverage information. They don't want advertisements about a discount on something they don't even want. They already have a PPE provider. He already gets his PPE somewhere else that he likes. During COVID, United Concordia offered him ability to get $10 off per patient just as being nice or something. And then they said, that's over. And so the fax says, we used to give you this ability to claim it. From now on, you're prohibited from claiming it. We're not on the hook for it. But here's some other company that we've negotiated a discount with. And they send that by fax. He doesn't want that by fax. What's your answer to Judge Gray's hypothetical that he said under the claimant's theory, even someone that just cut out some coupons and sent them to friends would be liable? Was he right about that or wrong about that? So in other words, the coupons are whatever, for a grocery store, and they're giving you 10% off this, and you just collect them and send them to your aunt or something. Would that person be liable? I thought about that. But he says that it's like a generous citizen. So your neighbor knows that you have a lawnmower, and here's some coupons for lawnmower stuff. And for some reason, they send it to your fax machine. But in your brief, I think it's another footnote five. I think you said that full stop is the word you used, I think. That person would be liable. Yeah, they would be. I had a Sixth Circuit argument on this opt-out notice they used to have. And the judge said if I call a pizza place and say fax me your menu and they fax it to me, they don't put an opt-out notice on there, is that a violation of the statute? I said, yes, it is, because the FCC said so. And then the appellate courts decided that the FCC didn't have the power to say so. But I didn't write the statute. I'm just the private attorney general trying to enforce a statute of the people who still use fax machines, doctors, dentists, pharmacists, they don't want this stuff on their fax machine. They don't want to weed through it. And employees do that. It wastes their time. It wastes the paper. It's the same as it was 30 years ago when they passed the law. They passed the Junk Fax Prevention Act of 2005, created a new basis for sending them. It was on the basis of an established business relationship in which somebody gave you their fax number. You still have to have an opt-out notice so they can tell you to stop. And they didn't have those here. All right, we'll give you a full rebuttal. Thank you, Your Honor. Thank you. Good morning. Good morning, Your Honors. May it please the Court, Justin Contal for Appellee United Concordia. Two things seem clear from this Court's TCPA jurisprudence. One is that TCPA violations are evaluated on a case-by-case basis, depending on the fact pattern involved. And the second is that context matters, particularly when deciding whether the statute's commercial requirement is met by the facsimiles in dispute. Here, the faxes were sent pursuant to the terms of an express contract that contemplated the transmission as a service to the recipient. That doesn't sound like a TCPA violation, and as the trial court properly concluded, providing a service authorized by the express terms of the party's contract is not what the TCPA addresses. And plaintiff has not cited a case suggesting that would be the case. Those contracts, counsel, were called marketing agreements? That's a question. Is that true? Yes, the contracts between United Concordia and the third party, such as ProfiMagic, when I was referring to the contract, I was referring to the contract between the dentist and United Concordia. And I guess, you know, I'm sure people in the advertising and marketing world would say that marketing and advertising are not precise synonyms, but they seem very similar to me. So, you know, if it's a marketing agreement, we're going to agree to market these things to our, you know, providers, and then we turn around and send these faxes. It's not marketing. Well, Your Honor, what the court said when assessing whether a fax meets the commercial requirement, and for it to be an advertisement, it has to meet that commercial component. And what this court has said is that the sender must have profit as a name. So it looks at it from the party who's being sued, the sender of the fax. And here, United Concordia had no profit motive. These dentists, they had already agreed, as part of their agreement, United Concordia sent the faxes to inform the plaintiff of discounts on third party products available under the value add program, which is one of the components that Dr. Lingus and other dentists received by being a member of United Concordia's network. And United Concordia was not paid to send the faxes. It didn't receive any money if somebody, if one of the dentists purchased the faxes. There's no, they're not soliciting business. These are already dentists who are within their network. These are dentists who are already part of their network. One of the benefits, it's explicitly stated in the dental reference guide that is incorporated by reference into the participating dentist agreement. One of the benefits is listed as providing discounts. And the UCCI is doing this to keep its dentists happy, to show that we are providing good services to you. It's a matter of good customer service. It's a matter, but they already agreed to provide it. They're just fulfilling the agreement with the dentist. It's something that they already said they were going to give them. So they're giving the dentist information that the dentist is already entitled to. Which in a global sense is in service of its business model. That's correct. That's correct, Your Honor. And, you know, Dr. Lingus, I'm sorry, Mr. Bach is saying Dr. Lingus didn't want these ads. But there are tens of thousands of dentists within United Concordia's network. And the record shows that some of the dentists did partake in the offers. United Concordia received no compensation for that. And no dentists have complained. Dr. Lingus is the only dentist who has complained. Can I get your help on something? So you have the insurance company's relationship with the vendors, so the ProfiMagic. Right. What does the record show about the insurance company's relationship to the dentists and their obligations vis-à-vis them? So put ProfiMagic's thing to the side. Don't they have some obligations about letting them know what's in plan and what's not, what's reimbursable, what's not? They do, Your Honor. And what does the contract say about that? As far as – In other words, I'm trying to figure out – it does look very commercial and advertisement-like. If your client has a relationship with vendors and is part of that exclusivity relationship, they're supposed to let the dentist know about discounts and availability, what's reimbursed and what's not, as a way of the vendors benefiting from this exclusive relationship. I'm trying to now figure out what's the contract relationship between the insurance company and the dentist. Is there anything that's analogous where they're – they actually are supposed to tell the dentist. Well, they are, Your Honor. How is that phrased? What does it say? Well, the participating dentist agreement, first of all, it states that dentist agrees to accept communications from United and Concordia via mail, facsimile or email at the address that's shown on the credential. That's the permission point. But what – I was actually thinking they were supposed to let them know how this worked. Well, they are because it's – I'm sorry. If I offer a service to Sutton that's not reimbursed, that's very relevant to me as the dentist because now I'm going to have to get Sutton to pay for this out of his own money. So aren't there huge informational requirements? Yes, Your Honor. There are informational requirements. One here is that this is one of the benefits that United Concordia agreed to provide. So by providing this information to the dentist about what's available, they are fulfilling the agreement that they have with the dentist. And you take – so I realize this overlaps with the consent point, but I think the contractual nature of this relationship is critical. It's something that the plaintiff completely tries to divorce the faxes from and its case from the – But let me – I'm just going to posit or guess that a lot of the communications between Concordia and the dentist don't look like this special fax bulletin, that a lot of them are these mailings that say, okay, here are the rules. Here's how we do it. Here's our covered. Here are not covered. So what do we do about what I suspect is the reality? That it's – they don't get tons of these fax bulletins as the way of communicating to the dentist what's covered and what's not. Well, the record in the case shows that there were 60 faxes sent back and forth between Dr. Lingus and United Concordia since 2017. So there were regular faxes. These were the ones that were placed – presumably at least two of them were placed in the file. And with regard to these faxes, it is important in the – when Dr. Lingus provided his fax number in 2014 on a fax change form, it says that we need to get you important information such as policy changes or information about patients. The first fax, as you rightly suggested, Chief Judge Sutton, the ProfiMagic, it was talking about a policy change. And as part of the value-add program, which is a service provided to the dentist by United Concordia, it's something that they agreed to provide, they were saying here's an alternative that you can use because that $10 benefit is going away. And so it was during COVID, during a period of time when communications could be difficult, at least regular mail communications, it was sent by fax. And there's also – the record shows that this type of information was sent to dentists in multiple ways. It was sent in check stuffers. It was sent in different ways to dentists. And it was – it's one of the benefits. The dentist could choose whether or not to partake in the offer, but it's something United Concordia agreed to provide, and it could be important to some dentists. It could be not important to others, but it's just one of the things that United Concordia agreed to provide. Are all of the main contracts between the dentist and the Concordia in the record? And I know there's the contract that has the permission point. Is there anything else that would count as about the contractual relationship between Concordia and the dentist? Well, in the participating dentist agreement, and we produced – The one that has that. The consent language. Okay, so that's really the one to look at. Well, that incorporates, by reference, the dental resource guide. And the dental resource guide includes all the policies and procedures, all the information about the plans. And in that dental reference guide, it states in a section titled, Advantages of Participation in United Concordia's Network, quote, access to exclusive discounts available only to our network dentists. So it's listed in the dental reference guide as one of the benefits that the dentist gets. And the dentist – and this goes to our argument about the dispute provision as well, but the dentist acknowledged that he knew about the dental reference guide in the contract, was aware of it, agreed to follow it, and was aware of its contents. Now, Dr. Lingus testified that he had never seen the dental reference guide before, that he didn't even know what it was with regard to Concordia. But in the contract, the dentist does agree to the dental reference guide being part of the agreement. So it's contemplated that as part of this contractual relationship, these types of communications will be sent. I'm actually looking at it from a slightly different angle, that Concordia might have been in trouble had they not communicated with the dentist. So in other words, it was their duty. Part of the contract was to make sure the dentist knew about discounted options, et cetera. So that's what I was trying to figure out in my head. Now, I guess that doesn't prove you have the right to do it by fax. That still probably begs that question a little bit. But I was trying to figure out if the ProfiMagic one was something, at least in general, they had to notify the dentist about. We're ending this one program. By the way, here's an option. And would dentists have been very upset had they only been notified they were ending the program? And only those who asked for it would get this new discount. Anyway, I was trying to figure out if they were obligated to let them know, not necessarily by fax, but obligated to communicate this. Yeah, it's a good question, Your Honor. And actually, that fax was sent. There was one fax that was sent that said, we're reminding you that the $10 benefit is going away. So it was a special fax bulletin that said, this $10 benefit is going away. It's a reimbursement that they were receiving pursuant to the agreement that was going away. Then the ProfiMagic fax followed. The record is Concordia went out. Because of the value-add program, because they promised to provide those discounts, they found a vendor for PPE. They sent a fax that said, the $10 benefit is going away. And here's an alternative that's available to you to receive discounted PPE. So it was a replacement for that. Just looking at the language of the statute, how is that fax not advertising the commercial availability of a good or service? Yeah, and I think the answer to that, Your Honor, is that in both Sandusky and in Fulton, the Court has stated that that language, that commercial component, should be viewed from the position of the sender and whether the sender has a profit motive. But haven't we also held in the Mohawk case that it can be advertising a third party's profit motive? Well, in Mohawk, it was a distributor of products. And they were trying to hold the third party whose products they were responsible. And the Court held that the products weren't responsible. But both the sender of the fax and the third party benefited. They had a profit motive there. There's no profit motive for United Concordia here. I'm not going to lose any of the people who sign on for the insurance? I'm sorry, Your Honor? I mean, UCCI isn't doing this because it is just a not-for-profit charitable institution which wants to make sure that dentists know all kinds of stuff, are they? That's right. But this is one of the benefits that they agreed to provide. And under the profit analysis, whether the commercial component and whether the sender has profit of a name, it can't be an ancillary remote hypothetical economic benefit. From these specific faxes, United Concordia received no direct benefit. It didn't receive any payment. The record is very clear on this. There's no payment. Either to send a fax for the third parties to be part of the value-add program, they receive no money for that, and there's no money to United Concordia if one of the dentists partakes in the offer. Now, plaintiff has pointed to various components of the contracts to say that there was some type of benefit to Concordia. We've explained in our brief why that's not the case. First of all, that argument was waived. It was never made below. It would be hunting for truffles in the record, which this court has said you shouldn't do because they never pointed it out to the district judge. But also, there's sworn testimony in an affidavit from United Concordia that they received nothing, and plaintiffs point to language in one of the agreements that has a reimbursement provision. Reimbursement provision is not profit, but the record is clear that there was no money paid under that provision, so United Concordia has not received any benefit. All right. Thank you very much. We appreciate your argument. We'll hear a rebuttal. I just wanted to point out that the dental reference guide, where it says this is like a 780-page document that you can find that says different things, different policies and procedures. In there it says identify some advantages of being a provider, and one of them is like the fifth one is that you can get discounts on stuff. Later in the same manual they say that you'll find all this kind of information in this thing they send you in the mail, or maybe you can get it online. And then they say we also have special mailings. We will send in the mail or to fax, we will send information about changes in coverage, claim payment policies or procedures. So the dentists don't agree to receive faxes, advertising, discounts on things that United Concordia thinks they might find helpful. But, I mean, this – it does seem to me an answer to the statute if you were contractually obligated to pass along the information. It doesn't sound like a commercial advertisement. When I'm giving you something, I'm obligated to give you. Like I'm supposed to tell you something under the contract. I now tell you it. And even if it has the form of a commercial advertisement, that does seem strange. Now maybe what that proves, though, is that's really a permission point. That really goes under a different heading. It's not, is this document a commercial advertisement anymore? It's if you're obligated to pass this stuff along, that really goes to permission. So I don't know. How do you think about that? I agree. The two issues get mixed together for some reason. But, you know, the statute says unsolicited advertisement. That's the term, not unsolicited advertisement. And so you're trying to figure out both of them. But the dentists don't agree to receive these advertisements on their fax machines. And United Concordia is not – if they're obligated to send the information – Like it's part of the contract. They would be liable because they delivered it through a fax rather than the mail? No, if the contract says they can do that, no. No, no, no. The contract's silent about how you deliver it. So it's a world in which the contract makes it crystal clear that Concordia has to tell the dentist about the discounts. So that's clear. But it's not clear the method of delivery. It doesn't say anything about that. Yeah. That seems very strange to me to call that a prohibited unsolicited commercial advertisement because they send it by fax, you know, perhaps during COVID when – very good reason to send things by fax. But at all events, put that to the side. That seems quite strange to me to call that, you know, barred unsolicited commercial advertisement. Well, I think the difference here is that they're not sending information that's required by contract. Right. Okay. Well, that's – I get that point. I get that point. But I find it very strange to say – Like we didn't assume about the special fax bulletin that says this stuff, we're not paying the $10 anymore. The earlier fax that counsel mentioned, that's not part of the case. It's the advertisements of discounted stuff you can get from somebody else that's part of their, you know, it's part of United Concordia's excited to announce this or whatever. They should announce it in the mail. Wouldn't some dentists have been really upset had they not been told about the 10% discount when it was replacing the $10 subsidy? No, I don't think so. I think they all would have already had PPE, and United Concordia was reimbursing some part of it only during COVID until they said they weren't going to anymore. Right, but then – But there's no reason to change your provider. There's no – so United Concordia, part of their – the contract isn't that they'll be the experts on the stuff the dentists need. That's the Gorse Motels cases about a contract where you agree to receive information to help you run your hotel with the franchisor, and they're going to do this for you, negotiate discounts and send it to you, and the people will be communicating. That's not this relationship. Dr. Lincas said he didn't need the one about the recycling buckets because he has different equipment. He can't use theirs unless he bought all new equipment. He doesn't need the discount on those recycling buckets. He's already got them, and he doesn't want to change just because they negotiated a discount, and the contract didn't require them to tell them about those. If you're right that the district court judge decision is wrong, what's your take on whether we should address the permission consent defense? Do you want us to do that, or do you want us to send that back to the district court if you're right on the key argument on appeal? Well, I mean, the Sixth Circuit has said that the Sixth Circuit prefers that the district court do it in the first instance, and the plaintiff would prefer to try to seek justice in the district court rather than coming here. We would try to convince the district court that we're right, and maybe the district court would agree that this is an advertisement, and then he could look at the permission. If the court tells him it's an advertisement, then he can look at permission, and they can bear the burden on that, and we can talk about the different cases there. But I don't think this court needs to do it. But the other circuits that have addressed how express permission is given have said that it has to be clear that the person giving the fax number understands that they'll be getting advertising, that it has to actually be expressed, not implied. And again, it's the lack of an opt-out notice. If they had an opt-out notice, they'd have a better argument. All right, I think we understand your argument. Thank you. Thanks to both of you for your helpful briefs and for answering our questions, which we always appreciate. Thank you very much. The case will be submitted, and the clerk may call the next case.